2021 IL App (1st) 192125

FIRST DISTRICT
SIXTH DIVISION
March 26, 2021

No. 1-19-2125

| | | |
|---|---|---|
| CHRISTINE GHOSTANYANS and TADEH GHOSTANYANS, Individually and as Parents and Next Friends of Landon Ghostanyans, a Minor, | ) ) ) ) | Circuit Court of Cook County |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) | No. 15 L 9669 |
| PAMELA GOODWIN, M.D. and NORTHSHORE ASSOCIATES IN GYNECOLOGY & OBSTETRICS, S.C., | ) ) ) ) | Honorable Elizabeth M. Budzinski |
| Defendants-Appellees. | ) | Judge, Presiding. |

JUSTICE HARRIS delivered the judgment of the court, with opinion.
Presiding Justice Mikva and Justice Connors concurred in the judgment and opinion.

## OPINION

¶ 1    Plaintiffs Christine Ghostanyans and Tadeh Ghostanyans, individually and as parents and next friends of Landon Ghostanyans, a minor, appeal a judgment following a jury trial for defendants Pamela Goodwin, M.D., and Northshore Associates in Gynecology & Obstetrics, S.C. (Associates). On appeal, plaintiffs contend that (1) the court erred in instructing the jury, and approving a special interrogatory, on sole proximate cause, (2) the court erred by allowing cross-examination of plaintiffs' expert to elicit his opinions regarding negligence of a codefendant who had settled, and (3) the jury's verdict was against the manifest weight of the evidence. For the reasons stated below, we affirm.

¶ 2                                    I. JURISDICTION

¶ 3     Plaintiffs brought this civil action against defendants, including Goodwin and Associates, and went to trial against only Goodwin and Associates after the other defendants were dismissed pursuant to a settlement. On May 9, 2019, following trial, the jury issued verdicts in favor of Goodwin and Associates, and the court entered judgment on the verdicts. On June 5, 2019, the court granted plaintiffs until June 14 to file their posttrial motion, which plaintiffs did on that day. The court denied the posttrial motion on September 19, 2019, and plaintiffs filed their notice of appeal on October 16, 2019. Accordingly, we have jurisdiction over this cause, pursuant to article VI, section 6, of the Illinois Constitution (Ill. Const. 1970, art. VI, § 6) and Illinois Supreme Court Rule 301 (eff. Feb. 1, 1994) and Rule 303 (eff. July 1, 2017).

¶ 4                                    II. BACKGROUND

¶ 5     This is a medical malpractice case regarding the August 24, 2012, birth of Landon Ghostanyans to plaintiffs, delivered by physicians, including Goodwin and Loren Hutter, M.D., at a hospital of Northshore University Health System (System). Goodwin was an employee of Associates, and Hutter was an agent or employee of System. During Landon's birth, Goodwin diagnosed a shoulder dystocia, which occurs when a fetus's shoulder gets blocked by or caught upon the mother's pubic bone during birth. Before trial, it was undisputed that downward traction was applied in an attempt to relieve the shoulder dystocia, but the parties disputed whether Goodwin, Hutter, or someone else did so and whether any of Goodwin's acts or omissions proximately caused any injuries to Landon. Shortly before trial, Hutter and System were dismissed as defendants pursuant to a settlement. At trial, the jury found for Goodwin and Associates and found by special interrogatory that the conduct of some person other than Goodwin was the sole proximate cause of Landon's injury. This appeal followed the denial of plaintiffs' posttrial motion.

¶ 6                                   A. Pretrial

¶ 7    The original complaint in September 2015 named Goodwin, Associates, and System as defendants and named respondents in discovery, including Hutter. Plaintiffs alleged that plaintiff Christine was a patient of Goodwin on and before August 24, 2012, and received prenatal care from Goodwin and Associates. On August 23, Christine was admitted to System's hospital as she was in labor, and Goodwin monitored her labor that day into the next. Goodwin "identified a turtle sign at the time of delivery of the fetal head" and "diagnosed a shoulder dystocia."[1] Thus, on "August 24, 2012, after the diagnosis of shoulder dystocia, downward traction was applied in an attempt to relieve the shoulder dystocia," and Landon's delivery took about four minutes. Landon suffered an avulsion of his C8 nerve root, brachial plexus palsy, injury to his phrenic nerve, and diaphragmatic palsy at the time of his delivery. Goodwin was allegedly an agent or employee of Associates and System, acting within the scope thereof, on August 24, 2012. Defendants were allegedly negligent for "a. Failing to utilize appropriate maneuvers to relieve shoulder dystocia; or b. Using downward traction in an attempt to relieve shoulder dystocia." These negligent acts or omissions were allegedly the proximate cause of Landon's injuries, pain and suffering, disfigurement, disability, and loss of a normal life, causing him to incur ongoing medical expenses and limiting his capacity to earn a living. In both counts, plaintiffs, as parents and next friends of Landon, sought more than $50,000 from defendants. Count I raised the aforesaid allegations, and count II additionally alleged that plaintiffs had incurred and would incur medical expenses for Landon proximately caused by defendants' negligence.

¶ 8    Attached to the complaint was the affidavit of plaintiffs' counsel that he consulted a board-certified obstetrician-gynecologist, who reviewed the relevant medical records and reached the

---

[1]A "turtle sign" is when a fetus's head appears, then retracts back inside.

opinion that Goodwin "deviated from the accepted standards of care of a reasonably careful physician in her treatment of" Landon. Attached to the affidavit was a report by a physician board-certified in obstetrics and gynecology that he reviewed medical records of Christine and Landon and formed the opinion to a reasonable degree of medical certainty that Goodwin "was professionally negligent and deviated from the standard of care expected of a reasonably careful obstetrician during the delivery of Landon." The report stated that "[a] shoulder dystocia occurred at the time of Landon's delivery," which Goodwin recognized, and "certain maneuvers were initiated in attempts to dislodge the impacted shoulder," as well as "use of downward traction as an attempt to complete the delivery." However, "application of traction by a physician in the presence of a shoulder dystocia is a deviation from the standard of care." Landon was later "diagnosed with brachial plexus palsy as a result of an avulsion of his C8 nerve root" and underwent nerve transfer surgery. The physician opined that the "condition of Landon's arm at delivery was consistent with injuries caused by physician-applied traction," with "no medically reasonable explanation for the extent of injuries other than the use of excessive downward traction by the physician during delivery," so that Goodwin's professional negligence caused Landon's brachial plexus palsy.

¶ 9   In November 2015, Goodwin and Associates appeared, as did System separately. In May 2016, each defendant filed an answer. They acknowledged that Christine was in labor and was admitted on August 23, 2012, to System's hospital, where Goodwin and Associates provided her prenatal care. They admitted that Goodwin monitored her labor that day into the next, "identified a turtle sign at the time of delivery of the fetal head," and "diagnosed a shoulder dystocia." They admitted that, on "August 24, 2012, after the diagnosis of shoulder dystocia, downward traction was applied in an attempt to relieve the shoulder dystocia," but Goodwin and Associates denied

that Goodwin applied downward traction. Goodwin and Associates admitted that Goodwin was an employee of Associates, while Goodwin and System denied that Goodwin was an agent or employee of System. Each defendant demanded strict proof of Landon's physical injuries and denied negligence, proximate causation, and damages.

¶ 10 Following some discovery, plaintiffs filed an amended complaint in March 2017, adding respondent Hutter as a defendant. Counts I and II were substantially identical to the initial complaint except for alleging that Goodwin "applied downward traction on [Landon's] head and neck" instead of the initial complaint's "downward traction was applied in an attempt to relieve the shoulder dystocia." Counts III and IV alleged that Hutter was a physician specializing in obstetrics and gynecology acting as an "on call" physician at System's hospital, who attended Landon's delivery on August 24, 2012, in that capacity. The counts alleged that "after the diagnosis of shoulder dystocia, [Hutter] applied downward traction to [Landon's] head and neck" and delivered Landon. Hutter was allegedly an agent or employee of System, acting in the scope thereof, on August 24, 2012. Hutter and System were allegedly negligent in "a. Failing to utilize appropriate maneuvers to relieve shoulder dystocia; or b. Using downward traction in an attempt to relieve shoulder dystocia," with substantially the same allegations of Landon's physical injuries, proximate causation, and damages as counts I and II.

¶ 11 Attached to the amended complaint was the affidavit of plaintiffs' counsel that he consulted a board-certified obstetrician-gynecologist who reviewed the relevant medical records and reached an opinion that Goodwin and Hutter "deviated from the accepted standards of care of reasonably careful physicians in their treatment of" Christine and Landon. Attached to the affidavit were two reports by a physician, board-certified in obstetrics and gynecology, that he or she reviewed various medical records of Christine and Landon and read Goodwin's deposition. He or she formed

5

opinions to a reasonable degree of medical certainty that Goodwin and Hutter each "was professionally negligent and deviated from the standard of care expected of a reasonably careful obstetrician" during Landon's delivery. A shoulder dystocia occurred during delivery, which Goodwin recognized and of which Hutter was aware. The report for Goodwin stated that "certain maneuvers were initiated in attempts to dislodge the impacted shoulder," as well as "use of downward traction as an attempt to complete the delivery." The report for Hutter stated that he "used traction in an attempt to deliver Landon." The reports stated that application of traction by a physician during a shoulder dystocia is a deviation from the standard of care. Landon was later diagnosed with a brachial plexus injury and an avulsion of his C8 nerve root, and he underwent surgery. The reports opined that the condition of Landon's arm at delivery was consistent with injuries caused by physician-applied traction, with no reasonable explanation for the extent of his injuries other than the use of excessive downward traction by a physician during delivery. Thus, Goodwin's and Hutter's professional negligence caused Landon's brachial plexus injuries.

¶ 12    Hutter and System answered the amended complaint. System answered counts I and II substantially as for the initial complaint. As to counts III and IV, Hutter and System admitted that Hutter—as an "on call" physician at System's hospital—was System's agent or employee, acting within the scope thereof on August 24, 2012, and he attended Landon's delivery and delivered Landon, but denied that he applied downward traction to Landon's head and neck. Hutter and System demanded strict proof of Landon's physical injuries and denied negligence, proximate causation, and damages. Goodwin and Associates also answered the amended complaint, answering counts I and II substantially as for the initial complaint and refraining from answering counts III and IV as not directed against them.

¶ 13 The case proceeded through discovery and was set for trial on April 30, 2019. On that day, the court ordered Hutter and System dismissed with prejudice, in an order stating that the case was "coming to be heard for trial" and would continue against Goodwin and Associates. Trial commenced on May 3. Hutter and System then filed a motion for a good faith finding regarding their $1.4 million settlement with plaintiffs. On May 9, the last day of trial, the court issued an amended order dismissing Hutter and System with prejudice based on the settlement. The court later entered a good faith finding.

¶ 14                                        B. Motions *In Limine*

¶ 15 During motions *in limine*, plaintiffs moved to "bar any standard of care opinions" regarding Hutter in light of his settlement and because "no expert has criticized Dr. Hutter's conduct." Defense counsel responded that plaintiffs' expert, Dr. Martin Gubernick, opined regarding Hutter so the defense should be able to cross-examine on that opinion. The court stated that

> "they can go into it on cross-examination. They don't need it to get the sole proximate cause defense, which is always the argument, you need standard of care testimony. But if your expert testified to that, because [Hutter] has settled out doesn't mean that any evidence regarding [Hutter] settled out of trial."

Plaintiff's counsel responded that he was not seeking to bar testimony "that there was another application of traction and that caused or contributed to the injuries" but only to bar opinion testimony that Hutter breached the standard of care. Defense counsel replied that it was proper to elicit from Gubernick that Hutter's traction was excessive to the point of deviating from the standard of care, which would be "essential to pointing out the contrast between [Goodwin and Hutter] and setting up the sole proximate cause argument for that instruction." The court noted that Gubernick could be cross-examined about Hutter's actions and defense counsel agreed to not argue

in opening statements that Hutter breached the standard of care so plaintiffs' counsel would not have to anticipate or "front" a counter-argument in his opening statement.

¶ 16    Plaintiffs also moved to bar testimony about potential causes of Landon's brachial plexus injuries other than physician-applied traction. They noted that medical records confirmed the use of traction, Goodwin admitted that she and Hutter used traction, and defense "retained experts agree that downward traction during shoulder dystocia is a well-established cause of brachial plexus." Plaintiffs argued that defense expert opinions that Landon's "brachial plexus injuries were caused by a combination of the traction used by the delivering physicians and other potential in-utero causes" were not based on anything in evidence, but upon medical literature citing anecdotal reports of brachial plexus injuries from the natural forces of labor. "Moreover, it is axiomatic that there may be more than one cause of an injury. Once the witnesses admit that physician-applied traction was 'a' cause of [Landon's] injuries, other potential causes are irrelevant." Defense counsel argued that both sets of experts would likely testify that, with shoulder dystocia, the expulsive force of labor would inherently be pushing the baby's shoulder, and thus the brachial plexus, into the mother's pubic bone. Plaintiffs argued that it was their theory that only excessive traction causes permanent injuries. Defense counsel argued that causation was a contested issue of fact. The court stated that it would review the depositions but was inclined to admit the evidence.

¶ 17                                C. Trial

¶ 18    Plaintiffs called defendant Goodwin as one of their witnesses.

¶ 19                                1. Goodwin

¶ 20    Obstetrician and gynecologist Goodwin testified to being a partner in defendant Associates. Plaintiff Christine was one of Goodwin's patients for many years, including her pregnancy with Landon.

¶ 21    A fetus generally rotates or "restitutes" before a physician acts to deliver the fetus, and the shoulder is often visible at that point, indicating that it is not impacted or stuck. Landon showed the turtle sign before restitution, so Goodwin had made no delivery efforts before then. Once a physician diagnoses a shoulder dystocia, he or she may insert a hand to determine where the fetus's shoulders are but might not do so immediately depending on the mother's contractions. A physician may also apply gentle traction to determine if there is a shoulder dystocia, as placing a hand inside "doesn't tell you the degree of impaction." While traction on the fetus's head or neck may cause stretching of the brachial plexus, which should be avoided, the physician does not know if there is a shoulder dystocia without applying gentle traction. Certain maneuvers are then tried to release the impaction or dystocia, after which Goodwin would apply "greater than typical" traction if they were unsuccessful. Goodwin explained gentle traction as a guiding traction and greater than typical traction as being greater than the gentle or guiding traction for an easy delivery. In Landon's birth, Goodwin applied traction after performing the aforesaid maneuvers twice and when she believed the impaction had been relieved. She acknowledged that she could have first reached inside to confirm the shoulder's release but did not in Landon's birth.

¶ 22    Hutter joined in Landon's delivery when Goodwin diagnosed the shoulder dystocia, but Goodwin was still directing the delivery participants. Hutter was trained on various procedures to perform when called upon, including being told of a shoulder dystocia, but was not aware of any particular complications with Landon before being called. Goodwin prepared the notes or report for Landon's delivery, and Hutter had told Goodwin that he had no independent recollection of the delivery. The "note doesn't mention Dr. Hutter's involvement until after the anterior shoulder was dislodged 'and then with gentle traction and maternal pushing effort assisted by Dr. Hutter the shoulder did deliver' " per the initial notes. A few days after the delivery, Goodwin amended the

notes to add "Dr. Hutter did assist with some downward traction with no movement in the anterior shoulder" before delivery. Hutter very briefly applied traction upon joining the delivery and stopped when Goodwin told him to. Both the initial and amended notes stated that Hutter applied traction a second time, which was successful in dislodging the shoulder.

¶ 23    On cross-examination, Goodwin testified that traction involves pulling a fetus's head gently, with one hand below it and the other above, consistently in the direction of birth (rather than downward or sideways) and combined with the mother's efforts. Traction is appropriate in delivering a baby if it is needed under the circumstances. There are degrees of traction to apply, as "you can tell if the shoulder is starting to come. You can feel it move." In other words, traction is applied subjectively by feel based on experience and whether the previous traction improved the situation. Goodwin denied ever applying excessive traction in delivering a baby and specifically denied simply pulling harder and harder on Landon until his shoulder was free. She "knew when to stop" applying traction. Applying gentle traction to diagnose shoulder dystocia is a generally-accepted obstetric practice. The turtle sign does not definitively diagnose shoulder dystocia; sometimes the turtle sign appears but the fetus shifts from the mother's next contraction and comes out. Sometimes "the only way to tell" is to apply gentle traction along with a maternal contraction, and that is what Goodwin did in Landon's birth. She then felt with her fingers to determine the shoulder's position, performed the aforesaid maneuvers, and applied gentle traction again when she believed the last maneuver had been successful. She did not apply greater traction because she could feel that the shoulder was still impacted; she would have applied greater traction if she had felt it working. Using gentle traction after trying various maneuvers to release the shoulder is accepted obstetric practice that Goodwin both followed and taught to medical students and interns.

10

¶ 24     The notes on Landon's birth were a brief summary dictated less than an hour later, and such notes are routinely edited within a week. Goodwin did not initially mention Hutter's first use of traction in her notes because she was somewhat "traumatized" at the time she dictated them. Complications as severe as Landon's were exceedingly rare for her: two occurrences of permanent injuries, including Landon, in about 3000 deliveries. Hutter joined Landon's delivery shortly after Goodwin diagnosed a shoulder dystocia, which commenced a well-practiced protocol of quickly bringing in other medical personnel. The protocol exists because shoulder dystocia is an emergency that can have severe consequences: the umbilical cord may be compressed, causing seizures and brain injury if the compression is complete and lasts too long. As soon as Hutter joined the delivery, he applied traction. Goodwin stopped him because she was still trying the other maneuvers. After she had tried other maneuvers and a second instance of gentle traction, Goodwin asked Hutter to try. Without first trying any maneuvers himself, he again applied traction, and this time the shoulder was released. It seemed like Hutter used "a lot more traction than I would apply," though Goodwin could not be certain. She acknowledged that her notes stated that Hutter applied gentle traction but explained that she had dictated what she would have done. She could not determine whether Hutter's actions released the shoulder. Landon's shoulder dystocia lasted about four minutes, which was long; Goodwin's previous longest dystocia was two and a half minutes.

¶ 25     On redirect examination, Goodwin testified that, in applying traction by feel, she cannot measure or know how much the brachial plexus is stretching from the traction. However, applying traction in the correct direction avoids undue stretching. She acknowledged that there are methods for a physician to place his or her hands inside to determine how much the shoulder is impacted. As to her notes stating that Hutter applied gentle traction, Goodwin reiterated that she dictated what she would usually do. "[I]n all fairness to Dr. Hutter, I had a hard time saying he didn't do

any maneuver and he gave traction and delivered the baby." She acknowledged not changing that part of her notes when she edited them a few days later.

¶ 26    On recross examination, Goodwin admitted that she should consider her notes as a legal document for possible litigation "but I don't." She was still hopeful when she dictated her notes that Landon's injury was not permanent and Hutter may not have applied excessive traction. As she edited her notes, she elided past the portion at issue "because I didn't want to think about it."

¶ 27                                2. Plaintiffs' Experts

¶ 28    Obstetrician and gynecologist Gubernick testified that shoulder dystocia is an obstetrical emergency addressed with detailed protocols. A fetus's shoulder sometimes becomes stuck or impacted before the head appears but more typically after that. Gentle traction is a guiding traction applied to ensure that the fetus continues traveling in the appropriate direction and does not become impacted, rather than directly to deliver the baby. It is not inappropriate, but also not always needed. While "there is a presumption that you would never want to use traction if it's stuck *** there are times that you need to apply gentle traction to know" the shoulder is impacted. If gentle traction reveals an impaction, "you stop all traction" because it would increase the impaction rather than releasing the shoulder. Continued traction would also put pressure on the nerves in the fetus's neck and could cause a brachial plexus injury. Instead, various maneuvers are applied to change the fetus's direction and the angle of the shoulder, none of which apply traction to the head or neck. Traction should be applied to relieve shoulder dystocia only if the umbilical cord is impinged, restricting oxygen to the fetus, for more than about seven minutes. Under such circumstances, nerve damage from applying excessive traction is the lesser evil to brain damage. The notes for such a delivery should reflect what was done and why it was necessary.

¶ 29     There was no reason for traction to be applied in Landon's delivery. According to the medical records and Goodwin's deposition, Landon showed the turtle sign, "an indication—not an absolute indication but a high concern that there is a shoulder dystocia." Goodwin applied gentle traction to confirm shoulder dystocia, then applied some of the aforesaid maneuvers. The medical records indicated that the shoulder was then released, but Goodwin's deposition testimony was that the shoulder was not released until Goodwin and then Hutter applied traction after the maneuvers. Only Goodwin's deposition described Hutter's actions, including first very briefly applying traction until Goodwin told him to stop. Hutter had no recollection of Landon's delivery and wrote no notes on the delivery.

¶ 30     Gubernick opined that Goodwin deviated from the standard of care for a reasonably careful physician in her second use of traction, which was more than appropriate gentle traction. Goodwin testified in her deposition that she would apply greater than gentle traction, which Gubernick explained was directly contrary to the standard of care because applying more traction to an impaction would worsen it. He also opined that Goodwin's deviation from the standard of care caused Landon's brachial plexus injury. "If you strictly go by her delivery note—and by the time Dr. Hutter delivers the baby, the shoulders have been disimpacted—her traction caused the entirety of this injury." Even accepting Goodwin's deposition testimony regarding Hutter, she contributed to the injury by adding to the traction pressure on Landon's brachial plexus. Neither gentle traction, nor maternal labor, nor Hutter applying traction after releasing the shoulder, as in the notes, would have caused Landon's permanent brachial plexus injury; the nerves would be stretched but not broken. Other possible causes of permanent injury other than traction were not reflected in Landon's medical records.

¶ 31    On cross-examination, Gubernick acknowledged that brachial plexus injury can sometimes occur regardless of the procedures used to release a shoulder dystocia and many brachial plexus injuries are not associated with a shoulder dystocia. He reiterated that gentle traction is used to diagnose shoulder dystocia and the turtle sign is not definitive. Thus, he opined, Goodwin's use of gentle traction initially to diagnose the dystocia would not breach the standard of care and would not contribute to a permanent brachial plexus injury. Similarly, when a physician or midwife believes that maneuvers have released a shoulder dystocia, it is appropriate to use gentle traction to confirm the shoulder has been released. While Goodwin testified in her deposition to doing just that, she also testified to using more traction than usual. Traction cannot be measured as it is applied to a fetus but is determined by feel from experience.

¶ 32    When asked if both Goodwin and Hutter applied excessive traction, Gubernick replied that Goodwin's deposition testimony supported that theory but her delivery notes did not reflect excessive traction by Hutter. When Gubernick was asked about his disclosed pretrial opinion that Hutter deviated from the standard of care in applying traction and the deviation caused Landon's injury, plaintiffs' counsel objected. The court overruled, and Gubernick acknowledged his earlier opinion. Hutter and others joined the delivery when Goodwin diagnosed a shoulder dystocia, as the purpose of the dystocia protocol is to have the assistance of personnel who may be able to perform the maneuvers differently. When asked if Goodwin would have asked Hutter to try if she believed the shoulder was released, Gubernick answered that Goodwin's notes reflected her belief that she released the shoulder before asking Hutter to try, and the reason for her request was unknown, as she may have been tired or afraid at that point.

¶ 33    Gubernick opined that Hutter was negligent if one believes Goodwin's deposition testimony and that Goodwin did nothing negligent other than apply excessive traction. He agreed

that there were four uses of traction: Goodwin's first to diagnose dystocia, Hutter's brief traction when he joined the delivery, Goodwin's second after the maneuvers, and Hutter's second, followed by Landon's delivery. However, Gubernick disagreed that only the last instance delivered Landon, as Hutter may have applied only gentle traction the second time with Landon's shoulder releasing spontaneously. He acknowledged that this theory was not supported by any account from Hutter.

¶ 34    On redirect examination, Gubernick observed that Goodwin's notes, both originally and revised, stated that Hutter applied gentle traction after the shoulder was released, and she testified in her deposition that she was unsure whether maneuvers had released the shoulder when she applied traction again. Gubernick based his opinion of Goodwin's negligence on that admission and her testimony that she applied "[m]ore than the average amount of traction" to impacted shoulders. It was not "reasonable for her to describe using more than normal traction to deliver a shoulder dystocia." As to Gubernick's cross-examination testimony that many brachial plexus injuries are not associated with a shoulder dystocia, he explained that a fetus's shoulder can be impacted, with a brachial plexus injury resulting from traction, absent a delivering physician diagnosing a dystocia. While "a healthy baby with no predisposing factors and no maternal factors" cannot suffer a permanent brachial plexus injury from "the endogenous forces of labor," a transient brachial plexus injury could result.

¶ 35    On recross examination, Gubernick acknowledged that Goodwin said she used only gentle traction in Landon's delivery, mentioning more than usual traction as a general matter. He did not agree that physicians may differ about what constitutes gentle traction, maintaining that they would agree "within a tight range." Specifically, gentle traction of zero to five pounds would not cause permanent brachial plexus injury.

15

¶ 36    Neurologist Dr. Stephen Deputy testified that he had treated several children for birth-related injuries to their brachial plexus, a bundle of nerves in the shoulder. Based on other physicians' examinations and testing, Landon had a severe brachial plexus injury causing various symptoms that had since improved somewhat, including a droopy left eyelid, a left pupil that would not dilate properly, and injuries to his diaphragm. The brachial plexus injury also affected the muscles of Landon's left arm, which at first could not move at all. His left arm could flex somewhat after several months of his nerves regenerating and recovered more after surgery to transplant nerve tissue. However, at some point nerve regeneration ceases, and Deputy opined that Landon had reached that point and his injury was permanent. Because muscles need nerve connections to work properly, a muscle with severe nerve damage atrophies. While Landon's shoulder movement had improved, atrophy had reduced the strength and range of motion of his left elbow, wrist, and hand. Occupational therapy could reduce some of these effects, but his left arm would never be normal.

¶ 37    When asked the cause of Landon's brachial plexus injury, Deputy explained that the "cause of babies that are born with brachial plexus injury at the time of delivery is that of a traction injury or a stretch injury to the nerve as opposed to a crush injury to the nerve." He opined that Landon suffered

> "an increased amount of traction with the head and neck with the shoulder being stuck
>
> behind, was part of the shoulder dystocia that then increased the angle of the neck to the
>
> shoulder, *** and when you do that, those brachial plexus nerves get stretched, and if you
>
> do it to a point where it's excessive force, you can have a permanent injury to the brachial
>
> plexus nerves."

A mild injury with full recovery would have resulted from traction, but Landon's permanent injury resulted from excessive traction. "[T]he more times you do that excessive traction, the more injury you have, and the more injury you have, the more likely you are going to have a permanent deficit."

¶ 38    On cross-examination, Deputy acknowledged that neurosurgeon Dr. Arthur DiPatri had decided in performing surgery on Landon that he had improved sufficiently that DiPatri did not have to explore his brachial plexus as planned. Deputy also acknowledged that occupational therapist Kathleen Needham had testified in deposition that Landon had made significant progress in being able to put on his own pants and shoes, though Deputy noted those to be two-handed activities. While Landon underwent occupational therapy, he had not been referred for physical therapy. Landon's functions could improve, dependent on both his cooperation and the physiology of his injury. From the medical records and depositions, Deputy was aware that Goodwin and Hutter had assisted Landon's birth but did not know which applied excessive traction. "I'm working my way back from the fact that Landon is born with a flaccid left arm and had a severe brachial plexus injury at the time of delivery, so the cause of brachial plexus injuries at delivery is always due to excessive traction." On redirect examination, Deputy testified that his focus was causation generally rather than who particularly caused the injury.

¶ 39    DiPatri's deposition was read at trial, and Needham's deposition video was shown at trial, but neither is included in the record on appeal. The parties stipulated that Needham had testified that Landon's dominant right side was unaffected and she was providing therapy for his left hand.

¶ 40    Accountant David Gibson testified to evaluating the impact of Landon's brachial plexus injury on his employability and future income, after reviewing medical records and depositions and interviewing plaintiff Christine. "Landon is limited in use of his left arm to essentially a helper arm" without much "independent function," so he "is at a disadvantage" in "any tasks that requires

17

bilateral dexterity," such as carrying anything with both hands, reaching above his head with both arms, or typing with both hands. He would be employable but his options would be limited. Gibson calculated his probable reduced income from census data on earnings by persons with various education levels with and without various injuries. Assuming Landon earned a bachelor's degree, he would earn an average of nearly $70,000 annually if not injured but about $58,000 annually with his injuries. His working lifetime would also be shortened. The present cash value of his lifetime earnings would be reduced by $917,306 with a high school diploma, $1,043,374 with an associate degree, or $1,582,504 with a baccalaureate degree. On cross-examination, Gibson acknowledged that limited use of one's nondominant arm was not one of the injuries addressed in the census data. Based on medical opinions, Gibson assumed in estimating Landon's reduced income that his physical limitations were permanent.

¶ 41                                    3. Plaintiffs

¶ 42    Plaintiff Tadeh testified that Landon's left arm was affected when Tadeh first saw him shortly after his birth and his left arm was paralyzed when he went home from the hospital over a month after his birth. He received therapy both at home and in a clinic four times a week from his infancy, and he had to wear a splint continuously for years. Landon attempted to swim but could not, nor could he catch a ball. He could dress himself but used only one arm to do so. His left arm weakness left him prone to balance issues such as frequent falling. Tadeh acknowledged that Landon's ability to use his left arm had improved. He was a smart and mostly happy child, but quick to anger due to frustration from the limited use of his left arm.

¶ 43    Plaintiff Christine testified that she was told shortly after Landon's birth that his left arm was injured, and his arm was limp when she first held him. He received therapy during his five weeks of hospitalization and at least weekly thereafter and would continue receiving therapy well

after trial. DiPatri performed surgery in June 2013 and Landon had to wear a brace afterwards. He made progress and was determined to continue his progress, but he also became frustrated due to his limited use of his left arm, resulting inability to perform two-handed tasks, and questions about his condition from others. Because of such questions, Landon asked what happened to his arm, and Christine and Tadeh told him that it was injured at birth. His left arm and hand are noticeably smaller than his right, and he can grasp items with his left hand but not heavy items.

¶ 44    The parties stipulated that Landon's medical expenses were $294,749.97 up to the trial.

¶ 45                                4. Directed Verdict Motion

¶ 46    Goodwin and Associates moved for a directed verdict, arguing that "Gubernick failed to testify as to what the standard of care actually required of Dr. Goodwin to prevent injury to Landon, and thus "failed to causally connect her actions to any injury." Gubernick was "not critical" of Landon's prenatal care or the fact that shoulder dystocia occurred. "He conceded Dr. Goodwin's actions to diagnose the shoulder dystocia—including the use of initial traction—were appropriate, and also conceded the maneuvers she utilized to try and dislodge Landon's shoulder were also appropriate" though unsuccessful, but did not establish what Goodwin should then have done. Goodwin and Associates also argued that Gubernick's opinions were speculative because "medical records do not mention at all that Dr. Goodwin ever used traction," so his opinion relied upon Goodwin's deposition and "assumes Dr. Goodwin was telling the truth about the use of traction, but *** lying when she testified the traction was 'gentle,' " and that "Goodwin's use of traction is what actually dislodged the shoulder when in fact, neither the deposition testimony nor the medical records indicate that Dr. Goodwin's use of traction accomplished this."

¶ 47    The court denied the directed verdict motion, except for ruling that the sole claim of negligence to be presented to the jury would be whether Goodwin applied excessive traction.

19

¶ 48                                    5. Defense Experts

¶ 49     Dr. Charles Adamczyk, an obstetrician and gynecologist, testified to reviewing materials in this case and forming opinions to a reasonable degree of medical certainty regarding Goodwin's conduct. He opined that Goodwin acted within the standard of care for an obstetrician and her actions were not a proximate cause of injury to Landon. He believed she performed the appropriate maneuvers after diagnosing a shoulder dystocia, applied "traction within the degree necessary to test each maneuver to see if the shoulder had freed," and did not apply excessive traction. Indeed, "there was no evidence that she *** applied traction in an excessive fashion." It was reasonable to apply traction to diagnose a dystocia, and Goodwin's second use of traction after performing maneuvers complied with the standard of care.

¶ 50     When Adamczyk learned obstetrics, he was taught methods for addressing shoulder dystocia, including when and how to apply traction, how to perform the various maneuvers to release an impacted shoulder, and how to use traction to confirm or disprove that maneuvers were successful. In his experience of delivering about 100-180 babies annually for over 20 years, about 30 annually had a shoulder dystocia requiring some maneuvers as well as gentle traction, and about 10 or 15 required more advanced maneuvers. Adamczyk's longest shoulder dystocia was about two and a half minutes. Landon's dystocia of about four minutes lasted "a long time," which would be "a true obstetrical emergency" because one lasting about five or six minutes would affect the oxygen supply to the fetus's brain and could cause brain damage. There would be considerable pressure on the obstetrician because a nurse would be reminding him or her of the duration of the dystocia and he or she would be balancing the risk of brain damage from trying more possibly unsuccessful maneuvers against the risk of nerve damage from applying traction. A new obstetrician would be more panicked, while an experienced one would develop "a reasonable

understanding about how much forces and pressures [they] need to apply." Because "[t]here haven't been any models that have been done to actually show what the break point is on the brachial plexus," a reasonably careful physician tries to avoid applying traction to a fetus's head or neck during dystocia, but some traction in the correct direction must be applied.

¶ 51     When Goodwin testified in her deposition that she applied a bit more traction in a dystocia than a routine delivery, Adamczyk believed she applied "a little bit more" than gentle downward traction to confirm that the shoulder was impacted. When asked if the same was true of her second use of traction, Adamczyk replied "I believe that with her experience she knew that there was a point where she should not exceed that." There is a spectrum or range of gentle traction, which an obstetrician develops from experience as there is no device or measurement to do so precisely. He or she knows to stop applying traction and apply maneuvers when traction is unsuccessful in moving the fetus. Goodwin expressly denied using excessive traction, which "speaks to her experience." Adamczyk believed she did not use excessive traction because "none of the maneuvers she did or the traction that she did apply actually resulted in delivery of the shoulder *** until Dr. Hutter got in there, and he applied the final amount of traction that effected delivery of the fetus." While the standard of care required Goodwin to check if the fetus had moved before using gentle traction again, by using her hands on the fetus, movement does not necessarily confirm that the shoulder has been released. Goodwin did not say that she was certain Landon's shoulder was released before she applied traction the second time, but she believed that the maneuvers had worked. Applying traction in such circumstances was appropriate and necessary.

¶ 52     Adamczyk was aware from reviewing the documents in this case that there were two versions—original and revised—of Goodwin's notes. When she stated in her revised notes that the shoulder was rotated until it was dislodged and then gentle traction with maternal pushing, assisted

by Hutter, delivered the shoulder, Adamczyk read it to mean that she moved Landon's shoulders and Hutter then "applied the traction necessary to effect the delivery of the shoulder." That would be inconsistent with Goodwin believing she moved the shoulder sufficiently for delivery but failing to do so with her second use of traction. In other words, her note suggested that someone was able to release the shoulder. Her deposition was unclear as to whether she believed she had sufficiently released the shoulder. She applied traction the second time "[b]ecause you have to test it *** to see if your rotational maneuver worked." Her revised notes were not identical to her deposition, as her note did not mention her second use of traction but her deposition did. However, both her note and deposition stated that she applied various maneuvers, and believed the shoulder to be released, and that Hutter joined the delivery and applied traction to deliver Landon. There was no evidence that Hutter tried any maneuvers before applying traction. Adamczyk believed Hutter used more than gentle traction because the dystocia had lasted four minutes by then, and more specifically anxiety and time pressure probably caused him to apply excessive traction.

¶ 53    Adamczyk did not know the exact cause of Landon's brachial plexus injury, as maternal labor efforts were also being applied and also strain the brachial plexus. When asked if brachial plexus injuries can occur, despite following medical procedures for addressing a shoulder dystocia, Adamczyk replied that the mother's labor efforts and traction both stretch the brachial plexus so that they are additive. An obstetrician cannot know how much force the mother is applying so he or she must use their experience; "it's a feel that you develop, and what that break point is is still unclear." There is no "way with the maneuvers that have been developed by the obstetrical community to ensure that every baby can be delivered without an injury."

¶ 54    On cross-examination, Adamczyk testified that obstetricians have developed procedures to "lessen the likelihood" of brachial plexus injury. There was no direct evidence that Hutter either

22

did or did not apply excessive traction. While adults are susceptible to hypoxia in about six minutes, babies can take longer. There was no direct evidence that Goodwin was concerned during Landon's four-minute dystocia about hypoxia or brain injury, though "in practice *** you'd be thinking about that at the time of delivery." Adamczyk acknowledged that it would be reasonable for a physician with such concerns to include them in his or her notes as an explanation for his or her actions, and he himself would have done that. Goodwin's notes reflected no uncertainty that the shoulder was released before she applied traction again, while she testified in her deposition that she could not determine if the shoulder had been released. In Adamczyk's various deliveries with shoulder dystocia, only one had permanent brachial plexus injuries, and it was caused by a trainee physician. An experienced physician would be less anxious and panicky but would still become somewhat more anxious after a dystocia lasted over two minutes.

¶ 55    A shoulder can be so impacted that only excessive traction would release it, but "[y]ou have to try" rotating it "if you can." In other words, the shoulder will generally deliver when maneuvers were successful but testing it with gentle traction is necessary. When asked again if there was any situation where no amount of traction would release the shoulder, Adamczyk replied that he did not know because he had never seen it happen; that is, "[u]sually it gives after a certain point." Adamczyk reiterated his opinion that Goodwin did not use excessive traction because her traction was unsuccessful in releasing the shoulder. While any amount of traction on the fetal head will stretch the brachial plexus to some degree, Landon suffered the most severe degree of brachial plexus injury. Maternal labor efforts stretch the brachial plexus, but physician-applied traction also

contributes to brachial plexus injury including Landon's. Thus, applying gentle traction based on a physician's experience increases the risk of brachial plexus injury but is necessary for delivery.

¶ 56    On redirect examination, Adamczyk testified that there is no way to prevent brachial plexus stretching once a shoulder dystocia has occurred because the dystocia itself causes stretching. Adamczyk opined from the medical records that Hutter "must have" used traction to deliver Landon's shoulder and Goodwin's gentle traction was insufficient to cause the degree of Landon's injury. When rotational maneuvers are insufficient to release the shoulder, and the prospect of brain damage is presumably increasing but the physician has no measure of the fetus's oxygen level, the concern for such injury and the pressure to act increases. That concern is inherent or implicit in hospital dystocia procedures, which were implemented in Landon's delivery.

¶ 57    On recross examination, Adamczyk testified that maternal labor forces are insufficient by themselves to cause a ruptured brachial plexus and "in most cases" excessive traction is necessary for rupture. He believed Goodwin did not apply excessive traction, not merely because she denied doing so but because her efforts did not deliver Landon's shoulder. Goodwin's accounts differed on whether Hutter applied gentle traction or may have applied something more. On further redirect, Adamczyk testified that both of Goodwin's accounts showed that Hutter applied traction and Landon's shoulder delivered. On further recross, he denied that Hutter applied traction after the shoulder was dislodged. However, Goodwin's notes stated that the shoulder was dislodged, and applying traction to a dislodged shoulder would not cause permanent brachial plexus injury. On further redirect, Adamczyk testified that a completely dislodged shoulder would have delivered by itself and Goodwin's second traction would have resulted in delivery. On further recross, he testified that Goodwin's notes reflected gentle traction by Hutter but Goodwin would have tested

24

the shoulder after maneuvers with traction. When asked if he believed the note, Adamczyk replied that Goodwin's note was "not all-inclusive of every second of everything that happened."

¶ 58   Economist Dr. Christopher Bartlett testified that he reviewed Landon's medical records and all the depositions and discovery responses, including those relating to Gibson, and formed opinions as an economist regarding Gibson's analysis. While Bartlett did not dispute the use of census data, he opined that Gibson used irrelevant data by using the earnings for persons reporting difficulty walking or climbing stairs, not upper-body issues like Landon. Also, much of the data concerned injuries to adults who had already completed their education and training, while Landon as a child would be able to choose education and training appropriate for his physical condition. Landon's occupational choices would be limited, and that might be an emotional loss for him. However, there was no indication that he would suffer an economic loss; that is, no indication that the jobs he was precluded from would earn more than the jobs he could still do.

¶ 59                                6. Further Trial Proceedings

¶ 60   Plaintiffs moved for a directed verdict, which the court denied.

¶ 61   At the jury instruction conference, plaintiffs objected to giving two paragraphs regarding a sole proximate cause as a defense to negligence: the second paragraph of Illinois Pattern Jury Instructions, Civil, No. 12.04 (approved Dec. 8, 2011) (hereinafter IPI Civil No. 12.04) concerning negligence by "some person" other than a defendant, and the second paragraph of Illinois Pattern Jury Instructions, Civil, No. 12.05 (approved Dec. 8, 2011) (hereinafter IPI Civil No. 12.05) regarding causation by "something" other than a defendant. Plaintiffs argued that there was no evidence of anything being a sole proximate cause because the evidence was that maternal labor forces and traction together or additively stretch the brachial plexus. Defense counsel argued that shoulder dystocia is a naturally occurring condition and the measures taken to relieve it are the

logical consequences of that condition, noting that Gubernick testified that some degree of traction is appropriate and necessary. Plaintiffs responded that the evidence was that maternal forces by themselves are insufficient to rupture the brachial plexus. The court agreed and denied the second paragraph in IPI Civil No. 12.05, over defense counsel's objection that giving only the first paragraph of IPI Civil No. 12.05 would be improper, without expressly addressing IPI Civil No. 12.04 beyond that it would be given.

¶ 62    Goodwin and Associates offered two special interrogatories regarding whether something or some person, other than Goodwin, was the sole proximate cause of Landon's injuries. Plaintiffs objected, reiterating the argument that there was no evidence of a sole proximate cause. Defense counsel argued that the some-person interrogatory was consistent with giving IPI Civil No. 12.04 with its second paragraph. The court noted that Gubernick testified to Hutter deviating from the standard of care, and plaintiffs responded that said testimony would not be evidence of sole proximate cause. When defense counsel noted that Deputy testified to repeated stretching of the brachial plexus as a cause, the court stated that it would not give the something interrogatory. The court ruled that the some-person interrogatory would be given to test the verdict regarding IPI Civil No. 12.04, which would be given with both paragraphs, and the something interrogatory would not be given because the second paragraph of IPI Civil No. 12.05 would not be given.

¶ 63    Following closing arguments, the court instructed the jury in relevant part:

> "If you decide that the defendant was negligent and that her negligence was a proximate cause of injury to Landon Ghostanyans, it is not a defense that something else may also have been a cause of the injury.
>
> More than one person may be to blame for causing an injury. If you decide that the defendant was negligent and that her negligence was a proximate cause of injury to Landon

Ghostanyans, it is not a defense that some third person who is not a party to the suit may also have been to blame.

However, if you decide that the sole proximate cause of injury to Landon Ghostanyans was the conduct of some person other than the defendant, then your verdict should be for the defendant." See IPI Civil Nos. 12.04, 12.05.

The verdict forms presented to the jury included an interrogatory on whether the sole proximate cause of Landon's injury was the conduct of some person other than Goodwin.

¶ 64 Following deliberations, the jury issued a verdict for Goodwin and Associates and answered the special interrogatory in the affirmative, finding that the sole proximate cause of Landon's injuries was the conduct of some person other than Goodwin. The court entered judgment in favor of Goodwin and Associates upon the verdict. As the jury deliberated, plaintiffs filed their second amended complaint, removing all allegations against Hutter and System.

¶ 65                                                    D. Posttrial

¶ 66 In their posttrial motion, plaintiffs argued that the court committed prejudicial error when it (1) instructed the jury on both paragraphs of IPI Civil No. 12.04 and allowed the special interrogatory on some person other than Goodwin being a sole proximate cause and (2) allowed defense counsel to cross-examine Gubernick on Hutter's negligence. Plaintiffs also argued that the jury's verdict and answer to the special interrogatory were against the manifest weight of the evidence. Plaintiffs argued that the trial evidence was that Goodwin's conduct was a proximate cause of Landon's injuries, with no evidence allowing the jury to infer that Hutter's conduct was the sole proximate cause. Thus, there was no evidence to support giving the second paragraph of IPI Civil No. 12.04 or the related special interrogatory. Gubernick testified to negligence by Hutter but did not testify that his negligence was the sole proximate cause of Landon's injuries. As

Gubernick testified that Landon's and Hutter's traction contributed to the injury, there was "no basis in the evidence for jurors to isolate Dr. Hutter's use of traction as the sole proximate cause." As to the proposition that Hutter applied excessive traction because only his second use of traction delivered Landon's shoulder, "the evidence established that his second use of traction likely occurred after the shoulder had been rotated, so it would not be injurious." As to allowing cross-examination of Gubernick regarding Hutter, plaintiffs argued that it did not impeach his direct testimony nor show his bias, so it was beyond the scope of cross-examination and its only purpose was to create prejudice.

¶ 67 Goodwin and Associates responded to the posttrial motion. An instruction on sole proximate cause can be given if some slight evidence supports it, even if no expert expressly opined as to sole proximate causation. Gubernick testified that excessive traction would cause Landon's brachial plexus injury, Goodwin testified that she did not use excessive traction but Hutter did, and Goodwin's testimony was borne out by the fact that Landon's shoulder was not delivered until after Hutter's second traction. The instruction could not be prejudicial because the evidence was overwhelming that Goodwin did not breach the standard of care. Gubernick's testimony that Goodwin applied excessive traction, then Hutter applied gentle traction, then Landon's shoulder delivered was "implausible," and the jury would realize so from Goodwin's testimony. Also, Gubernick never opined as to what should have been done to avoid injuring Landon. The two-issue rule would also bar reversible error, as the jury instruction and interrogatory at issue concerned proximate causation but whether Goodwin breached the duty of care was also at issue and a proper independent basis for the jury's verdict. As to cross-examining Gubernick regarding Hutter, cross-examination of expert witnesses is liberal, including allowing examination akin to direct examination at the court's discretion, and Gubernick's testimony was

relevant to the credibility of his direct testimony. Lastly, the verdict was not contrary to the evidence from Goodwin and Adamczyk.

¶ 68     At the hearing on the posttrial motion, plaintiffs argued that no defense witness testified that Hutter caused Landon's injuries, much less was the sole proximate cause, and that there was evidence from Goodwin and Adamczyk that both Goodwin and Hutter used more than gentle traction. The second paragraph of IPI Civil No. 12.05 was not given because Adamczyk testified to multiple combined causes for Landon's injuries. Defense counsel argued that IPI Civil No. 12.05 was denied because maternal labor forces were the proposed other cause there, which is distinguishable from Hutter's use of traction for IPI Civil No. 12.04 purposes, and that jurors are free to believe or disbelieve expert testimony. While there were discrepancies in Goodwin's accounts, the decisive fact is that the shoulder was not delivered when she asked Hutter to try and then delivered after he applied traction. It is not required that a witness expressly testify to sole proximate cause for a sole proximate cause instruction to be appropriate.

¶ 69     The court denied the posttrial motion, finding sufficient evidence for giving IPI Civil No. 12.04 and the related special interrogatory, which "doesn't have to be an expert saying that its sole proximate cause." As to the cross-examination of Gubernick regarding Hutter, it was related to Gubernick's credibility. Lastly, the jury was faced with a "battle of the experts," and its verdicts, including the special interrogatory on sole proximate cause, were not against the manifest weight of the evidence. This appeal followed.

¶ 70                                    III. ANALYSIS

¶ 71     On appeal, plaintiffs contend that (1) the court erred in giving the jury the long version of IPI Civil No. 12.04 and compounded the error by presenting the jury with a special interrogatory on sole proximate cause, (2) the court erred by allowing cross-examination of Gubernick to elicit

29

his opinions regarding the negligence of Hutter after he had been dismissed pursuant to settlement, and (3) the jury's verdict and finding were against the manifest weight of the evidence.

¶ 72                                A. Sole Proximate Cause

¶ 73    Plaintiffs first contend that the trial court erred in giving the jury the long version of IPI Civil No. 12.04 on sole proximate cause and compounded the error by presenting the jury with a special interrogatory on sole proximate cause.

¶ 74    A defendant may not only rebut evidence tending to show that his or her acts were negligent and the proximate cause of the plaintiff's alleged injuries, but also may try to establish by competent evidence that the conduct of a third person, or some other causative factor, was the sole proximate cause of those injuries. *Leonardi v. Loyola University of Chicago*, 168 Ill. 2d 83, 101 (1995). Sole proximate cause need not be pled as an affirmative defense but is sufficiently pled by denying that an injury was caused by the defendant's conduct. *Id.* at 93-94, 101. A party has the right to have the jury fully instructed on any theory of the case supported by evidence, however slight. *Id.* at 100. Giving a sole proximate cause jury instruction requires only that the defendant present some evidence that the third or other person was the sole proximate cause of the plaintiff's injuries. *McDonnell v. McPartlin*, 192 Ill. 2d 505, 516 (2000). A defendant need not show that the other person's actions were negligent, only that those actions were the sole proximate cause of the plaintiff's injuries. *Id.* at 519. Allowing a sole proximate cause defense does not confuse a jury or distract it from determining whether a particular defendant caused, in whole or in part, a plaintiff's injury but focuses the attention of a properly instructed jury on the plaintiff's duty to prove that the defendant's conduct was a proximate cause of his or her injuries. *Leonardi*, 168 Ill. 2d at 94.

¶ 75    Illinois Supreme Court Rule 239(a) (eff. Apr. 8, 2013) governing jury instructions provides:

"Whenever Illinois Pattern Jury Instructions (IPI), Civil, contains an instruction applicable in a civil case, giving due consideration to the facts and the prevailing law, and the court determines that the jury should be instructed on the subject, the IPI instruction shall be used, unless the court determines that it does not accurately state the law."

¶ 76    IPI Civil No. 12.04 is titled "Concurrent Negligence Other Than Defendant's" and is intended to be given when "negligence of a person who is not a party to the suit may have concurred or contributed to cause the occurrence." IPI Civil No. 12.04, Notes on Use. The instruction states:

"More than one person may be to blame for causing an injury. If you decide that a [the] defendant[s] was [were] negligent and that his [their] negligence was a proximate cause of injury to the plaintiff, it is not a defense that some third person who is not a party to the suit may also have been to blame.

[However, if you decide that the sole proximate cause of injury to the plaintiff was the conduct of some person other than the defendant, then your verdict should be for the defendant.]" IPI Civil No. 12.04.

The bracketed "second paragraph should be used only where there is evidence tending to show that the sole proximate cause of the occurrence was the conduct of a third person." IPI Civil No. 12.04, Notes on Use.

¶ 77    IPI Civil No. 12.05 is titled "Negligence—Intervention of Outside Agency" and states:

"If you decide that a [the] defendant[s] was [were] negligent and that his [their] negligence was a proximate cause of injury to the plaintiff, it is not a defense that something else may also have been a cause of the injury.

31

[However, if you decide that the sole proximate cause of injury to the plaintiff was something other than the conduct of the defendant, then your verdict should be for the defendant.]" IPI Civil No. 12.05.

Similar to IPI Civil No. 12.04, IPI Civil No. 12.05 provides that the bracketed "second paragraph should be used only where there is evidence tending to show that the sole proximate cause of the occurrence was something other than the conduct of the defendant." IPI Civil No. 12.05, Notes on Use.

¶ 78    A jury instruction is justified if it is supported by some evidence in the record, and the trial court has discretion in deciding which issues are raised by the evidence. *Tirado v. Slavin*, 2019 IL App (1st) 181705, ¶ 53. In reviewing a jury instruction issue, we consider whether the instructions, as a whole, fairly and comprehensively informed the jury of the relevant legal principles. *Id.* Even where an instruction is faulty, we will not reverse unless the instructions clearly misled the jury and prejudiced the appellant. *Blockmon v. McClellan*, 2019 IL App (1st) 180420, ¶ 41.

¶ 79    Here, plaintiffs note that this court has held that "in complex cases expert testimony is often necessary to constitute 'competent evidence' that the sole proximate cause of a plaintiff's injury is the conduct of a nonparty or some other cause," and in medical negligence cases, "expert testimony on the matter is still necessary before a defendant can argue" sole proximate cause. *Grauer v. Clare Oaks*, 2019 IL App (1st) 180835, ¶ 111. However, it does not follow that an expert witness must expressly opine that another person was the sole proximate cause of the plaintiff's injuries. As stated above, the evidence supporting an instruction must *tend* to show sole proximate causation.

¶ 80    We find sufficient evidentiary basis for giving IPI Civil No. 12.04 with the sole proximate cause paragraph in the testimony of medical experts, including defendant Goodwin, an experienced obstetrician and gynecologist. Goodwin testified to applying traction twice, the first

time to confirm the shoulder dystocia and the second after performing various maneuvers trying to release the shoulder. While Goodwin testified that her second use of traction was more than gentle traction, a point seized upon by Gubernick to opine that she was negligent, she clarified that she meant more than the gentle traction used in a routine delivery, squarely denied applying excessive traction, and expressed her awareness from her obstetric experience of the different degrees or amounts of traction. Goodwin testified that Hutter applied traction twice, his second time being after her second time and, crucially, followed by Landon's delivery. While Goodwin's accounts over time were inconsistent as to whether Hutter's second application of traction may have been excessive, she offered the jury an explanation for having stated that Hutter applied gentle traction.

¶ 81    Moreover, Adamczyk opined that Goodwin did not use excessive traction, based not just on her denial but on the fact that her second use of traction did not release Landon's shoulder while Hutter's second use did. Adamczyk rejected the theory that Hutter's second use of traction was after the shoulder was dislodged, opining that a dislodged shoulder would have delivered by itself and Goodwin's second use of traction would have resulted in delivery. Gubernick testified that gentle traction to diagnose or test shoulder dystocia would not contribute to a permanent brachial plexus injury, and Deputy testified that traction would cause transient or temporary brachial plexus injury while excessive traction would cause permanent injury. Lastly, while there was evidence that maternal labor forces and traction are additive, Gubernick and Adamczyk testified that maternal labor is insufficient to sever the brachial plexus. The court acted consistently with that evidence when it gave the second paragraph of IPI Civil No. 12.04 but not the second paragraph of IPI Civil No. 12.05. In sum, we find evidence that, taken together, would reasonably support a

33

conclusion that Goodwin did not apply excessive traction and Hutter did. Under the circumstances, that conclusion supports a sole proximate cause theory and jury instruction.

¶ 82    Related to the issue of giving of the sole proximate cause paragraph of IPI Civil No. 12.04 is the issue of giving the sole proximate cause special interrogatory.

¶ 83    The purpose of a special interrogatory is to be a check on the general verdict, testing it against the jury's determination of one or more specific issues of ultimate fact. *Douglas v. Arlington Park Racecourse, LLC*, 2018 IL App (1st) 162962, ¶ 70. A special interrogatory is proper if (1) it relates to an ultimate issue of fact and (2) at least one of the answers would be inconsistent with one of the general verdict options. *Blockmon*, 2019 IL App (1st) 180420, ¶ 35. We review *de novo* the propriety of a special interrogatory. *Id.* (citing 735 ILCS 5/2-1108 (West 2016)). However, a defective special interrogatory warrants overturning a verdict only upon a showing of jury confusion or prejudice to the appellant. *Douglas*, 2018 IL App (1st) 162962, ¶ 66.

¶ 84    Here, whether someone other than Goodwin was the sole proximate cause of Landon's injuries relates to causation, an issue of ultimate fact, and a "no" to the interrogatory would have been inconsistent with a verdict for Goodwin and Associates. As in *Douglas*, "[t]he special interrogatory tracked *** the second paragraph of IPI Civil No. 12.04 submitted to the jury," and "[w]e determined above that the jury was properly instructed on sole proximate cause via the long form of IPI Civil No. 12.04." *Id.* ¶¶ 67, 72. As in *Douglas*, there was no inconsistency between the general verdict for Goodwin and Associates and the interrogatory answer that someone other than Goodwin was the sole proximate cause of Landon's injuries. See *id.* ¶ 71. Thus, as in *Douglas*, "[w]e do not see how plaintiffs could possibly establish prejudice from the special interrogatory," "[n]or could we possibly find jury confusion when (1) the jury was properly instructed via IPI Civil No. 12.04 on sole proximate cause, (2) the special interrogatory tracked that jury instruction

***, and (3) the jury's general verdict and its special finding were entirely consistent." *Id.* ¶¶ 72-73.

¶ 85                                    B. Cross-examination of Gubernick

¶ 86    Plaintiffs also contend that the trial court erred by allowing cross-examination of Gubernick to elicit his opinions regarding the negligence of Hutter after he had been dismissed pursuant to settlement. They argue that whether Hutter's actions contributed to Landon's injury was relevant but whether those actions were negligent was not relevant.

¶ 87    The scope of cross-examination is within the trial court's discretion, and we will not disturb it on review absent a clear abuse of discretion resulting in manifest prejudice to the appellant. *McDonnell*, 192 Ill. 2d at 533. One purpose of cross-examination is to test the credibility of the witness. *Id.* Another is to develop the facts, data, and opinions that form the basis of an expert witness's opinion, whether or not they were elicited on direct examination. *Karn v. Aspen Commercial Painting, Inc.*, 2019 IL App (1st) 173194, ¶ 16.

¶ 88    Here, the questions of whether Hutter's actions caused Landon's injuries and whether Hutter was negligent were intimately related, so that we must reject the contention that the former was relevant but the latter was not. Who may have applied excessive traction and when, and the difference between gentle and excessive traction, were central issues in this case. Evidence on those issues can reasonably be characterized as relating to both causation and breach of duty.

¶ 89    *Bauer v. Memorial Hospital*, 377 Ill. App. 3d 895, 915 (2007), relied upon by plaintiffs, is distinguishable on three grounds. Firstly, the issue in *Bauer* was whether the trial court abused its discretion in *barring* cross-examination of a plaintiff's expert witness regarding a third party's negligence. *Id.* It does not follow from the conclusion that the *Bauer* trial court did not abuse its discretion that the trial court here abused its discretion when it *allowed* such cross-examination.

Secondly, the *Bauer* court found the desired cross-examination to be beyond the scope of direct examination, while we cannot reach that conclusion here as explained above (*supra* ¶ 88). Lastly, the *Bauer* court found no error because the defendant "offered no evidence that the conduct of the settling defendants was the *sole* proximate cause of [the plaintiff's] injuries." (Emphasis in original.) *Bauer*, 377 Ill. App. 3d at 915. By contrast, sole proximate cause evidence was presented here as explained in detail above (*supra* ¶¶ 80-81).

¶ 90    We find that the trial court did not abuse its discretion in allowing defense counsel to cross-examination Gubernick regarding Hutter's negligence.

¶ 91                                C. Manifest Weight of the Evidence

¶ 92    Lastly, plaintiffs contend that the jury's verdict and finding were against the manifest weight of the evidence.

¶ 93    To succeed on a negligence claim, a plaintiff must prove that a defendant owed a duty to plaintiff, breached that duty, and plaintiff suffered injuries proximately caused by the breach. *Douglas*, 2018 IL App (1st) 162962, ¶ 34 (citing *Leonardi*, 168 Ill. 2d at 93). There can be more than one proximate cause of a plaintiff's injury, and a defendant is liable if the plaintiff proves that the defendant's breach of duty was one of the causes of his or her injuries. *Id.* A verdict is against the manifest weight of the evidence only when the opposite conclusion is clearly evident or the verdict was unreasonable, arbitrary, and not based on the evidence. *Biundo v. Bolton*, 2020 IL App (1st) 191970, ¶ 42. It is the jury's responsibility to resolve conflicts in the evidence, determine the credibility of witnesses, and decide the weight to be given to the witnesses' testimony. *Id.* ¶ 52. Therefore, we cannot reweigh the evidence or substitute our judgment for that of the jury. *Id.* ¶ 42.

¶ 94    Here, we cannot conclude that the jury's general verdict for Goodwin and Associates, nor its finding that someone other than Goodwin caused Landon's injuries, were against the manifest

weight of the evidence. For the reasons stated above in discussing the sole proximate cause instruction (*supra* ¶¶ 80-81), we find that there was evidence that, if believed by the jury, would reasonably cause it to conclude that Hutter applied excessive traction and Goodwin did not, so that Goodwin did not cause Landon's permanent brachial plexus injury. In other words, while there were material discrepancies between Goodwin's accounts of events before and at trial, a reasonable trier of fact could find her trial testimony credible, especially in light of the other medical expert testimony, and find in her favor.

¶ 95                                         IV. CONCLUSION

¶ 96     Accordingly, the judgment in favor of Goodwin and Associates is affirmed.

¶ 97     Affirmed.

---

**No. 1-19-2125**

---

| | |
|---|---|
| **Cite as:** | *Ghostanyans v. Goodwin*, 2021 IL App (1st) 192125 |

---

| | |
|---|---|
| **Decision Under Review:** | Appeal from the Circuit Court of Cook County, No. 15-L-9669; the Hon. Elizabeth M. Budzinski, Judge, presiding. |

---

| | |
|---|---|
| **Attorneys for Appellant:** | Thomas G. Siracusa, of Power, Rogers & Smith, LLP, of Chicago, for appellants. |

---

| | |
|---|---|
| **Attorneys for Appellee:** | Karen Kies DeGrand and Laura Coffey Ieremia, of Donohue Brown Mathewson & Smyth LLC, and Mark J. Smith and Samantha N. LaFata, of Smith Blake Hill LLC, both of Chicago, for appellees. |

---